# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JAMES RIVEST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2019-0848-PWG |
| | ) | |
| HAUPPAUGE DIGITAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: June 7, 2022
Date Decided: **SEPTEMBER 1, 2022**

Marcus E. Montejo, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; *Attorney for Plaintiff*.

Douglas J. Cummings, DCUMMINGS LAW, LLC, Wilmington, Delaware; *Attorney for Defendant*.

**LASTER, V.C.**

Through this action, plaintiff James Rivest seeks to inspect the books and records of defendant Hauppauge Digital, Inc. (the "Company") under Section 220 of the Delaware General Corporation Law (the "DGCL"). Rivest wants to conduct the inspection for the proper purpose of valuing his shares. The universe of documents that Rivest has requested is exceedingly narrow. He only asks for annual and quarterly financial statements for closed periods.

Rivest's need for information is significant. The Company was once publicly registered with the Securities and Exchange Commission (the "SEC") but opted to "go dark" in 2014. Since then, the Company has not made any public disclosures. Nor has it provided any financial information to any stockholder. The Company has not even held an annual meeting.

The Company ignored Rivest's first two demands. When Rivest filed this action, the Company ignored that too. After Rivest secured a default judgment, the Company roused itself, successfully moved to re-open the default judgment, and began to litigate the case. At that point, the Company maintained that Rivest lacked a proper purpose for inspection. As the case unfolded, the Company upped the ante by accusing Rivest of having an affirmatively improper purpose for his inspection, and the Company also accused him of discovery misconduct. At trial, the Company insisted that any production be subject to the strongest possible confidentiality restriction and for that restriction to last indefinitely.

The parties litigated their disputes before a Master in Chancery, who handled the case with professionalism and diligence. After holding a one-day trial, the Master issued a thorough and thoughtful report in which she recommended that the court order production

of the Company's annual and quarterly financial statements for periods from 2016 through 2020, subject to a confidentiality restriction on information less than two years old (the "Report"). *Rivest v. Hauppauge Digit., Inc.* (*Report*), 2022 WL 203202 (Del. Ch. Jan. 24, 2022) (Griffin, M.).

In her Report, the Master considered and recommended that the court reject the Company's argument that Rivest was pursuing books and records for an improper purpose. She recommended instead that the court find that Rivest was seeking books and records for the proper purpose of valuing his shares. No one has taken exceptions to that ruling, which is therefore adopted as a ruling of this court.

In her Report, the Master also carefully considered the parties' divergent positions on the confidentiality restriction. The Master recommended that the court find the Company to have shown a basis to impose a confidentiality restriction, and she recommended that the restriction last for two years.

Rivest took exception to the Master's recommendation on the confidentiality restriction. He observes that in *Tiger v. Boast Apparel, Inc.*, 214 A.3d 933, 938–39 (Del. 2019), the Delaware Supreme Court rejected any presumption of confidentiality for Section 220 productions. The Delaware Supreme Court held that the target of the Section 220 demand must show that a confidentiality restriction is warranted. *See id.* at 935, 939. The petitioner may counter the target's showing. In determining whether to impose a confidentiality restriction, the court must assess and compare the benefits and harms that the parties have identified, then tailor an outcome to the facts of the case. *Id.* at 939. An

2

indefinite restriction such as the one the Company requested "should be the exception and not the rule." *Id.*

As Rivest sees it, the Company sought to justify a confidentiality restriction by making a formulaic argument, readily available to virtually any company. That argument boiled down to the assertion that if a competitor came to possess the Company's financial statements, then the competitor might use them to its advantage and harm the Company's interests. As the only factual support for its claimed threat of harm, the Company's witnesses recalled two instances from 2014, some eight years ago, before the Company went dark. At the time, the Company's financial statements carried a going-concern qualification. One of the Company's principal customers replaced the Company with a different supplier, and two of its manufacturers reduced the level of credit they extended to the Company. The Company's witnesses could not cite any more recent incidents. They nevertheless asserted that producing the Company's financial statements without a confidentiality restriction would threaten the Company with destruction. It takes some chutzpah for a company to accept investors' money by accessing the public equity markets, then claim that the disclosure of basic financial information would have apocalyptic consequences.

Rivest argues that under *Tiger*, the Company's formulaic argument is not sufficient to support a confidentiality restriction. He maintains that if a corporation could justify a confidentiality restriction simply by pointing to a standard risk associated with operating in a competitive industry, then this court would be applying a presumption by another name.

3

Turning to the balancing that *Tiger* calls for, Rivest argues that the Company's meager showing cannot outweigh his interests as a stockholder in using the Company's financial statements to value his shares. Rivest explains that as part of the process of valuing his interest in a long dark company, he wants to speak with other stockholders about the Company, and he needs to provide other stockholders with the Company's recent financial statements for those discussions to be meaningful. He observes that the Master's recommended confidentiality restriction would not permit him to share financial information from the last two years with fellow stockholders so they could discuss a valuation. Rivest also explains that he may seek a quotation for the Company's shares from a broker-dealer, which he can do under rules recently promulgated by the SEC. For a broker-dealer to provide a quotation in compliance with the SEC rules, the broker-dealer must have access to "current" financial statements, defined to include a balance sheet that is less then sixteen months old. Rivest observes that the Master's recommended confidentiality restriction would prevent him from providing financial statements to the broker-dealer that could support a quotation in compliance with the SEC rules.

As noted, the Master recommended that the court impose a two-year confidentiality restriction. In making that recommendation, the Master relied heavily on *Southpaw Credit Opportunity Master Fund LP v. Advanced Battery Techs., Inc.*, 2015 WL 915486 (Del. Ch. Feb. 26, 2015). That decision predated *Tiger*, and it both followed and endorsed the then-prevailing practice of implementing a prophylactic confidentiality restriction with the expectation that the parties would meet and confer regarding the treatment of specific documents, then approach the court with any disputes. In *Tiger*, the Delaware Supreme

4

Court rejected that practice as incorrectly applying a presumption of confidentiality. The high court identified *Southpaw* as one of the decisions that had incorrectly granted confidentiality as a matter of course.

The approach the Master took in this case is a reasonable one, and it reflects how this court consistently approached confidentiality restrictions before *Tiger*. If I were reviewing the Report under a deferential standard of review, such as for abuse of discretion or clear error, then I would adopt the Master's recommendation and impose a two-year confidentiality restriction. The Delaware Supreme Court has held, however, that when a party takes exceptions to a master's report, a constitutional judge must conduct a *de novo* review as to both the facts and the law. *DiGiacobbe v. Sestak*, 743 A.2d 180, 184 (Del. 1999) ("[T]he standard of review for a master's findings—both factual and legal—is *de novo*").

Applying a *de novo* standard, I find that the Company failed to carry its burden to establish a need for a confidentiality restriction for annual and quarterly financial statements for closed periods. The testimony that the Company's witnesses gave bordered on the hyperbolic and lacked credibility. At best for the Company, its witnesses identified one of the realities of doing business in a market economy. In my view, the Company's showing was insufficient, and crediting it would contravene *Tiger* by adopting the functional equivalent of a presumption. The only real difference between the pre-*Tiger* regime and the functional presumption would be that a corporation would need to have a witness give testimony about a worry that many business owners undoubtedly have.

Even if I credited the Company with making a showing sufficient in the abstract to support a confidentiality restriction of some type, I find that the Company failed to point to a sufficient interest that could outweigh Rivest's countervailing interest in valuing his shares. In determining a value for his interest in this long dark corporation, Rivest explained that he wishes to be able to communicate with other stockholders about the Company's value and potentially obtain a quotation from a broker-dealer in compliance with the SEC rules. Rivest should be able to pursue those avenues.

Rivest accordingly may inspect the Company's quarterly and annual financial statements and reports for periods from 2016 through 2020. The financial statements are not subject to any confidentiality restrictions.

## I.     FACTUAL BACKGROUND

The parties held a one-day trial before the Master using the Zoom videoconference system. The parties introduced sixty-six exhibits. Three fact witnesses testified live.[1] The trial was recorded so that a constitutional judge could review the proceedings *de novo*.

The following facts constitute my findings after a *de novo* review of the record. In many instances, I have viewed the evidence in the same way as the Master, and I have included citations to pertinent portions of the Report. In some instances, I have weighed

---

[1] Citations in the form "PTO ¶ —" refer to stipulated facts in Section II of the pre-trial order. Dkt. 47. Citations in the form "[Name] Tr." refer to witness testimony from the trial transcript. Citations in the form "JX — at —" refer to a trial exhibit with the page designated by the internal page number. If a trial exhibit used paragraph numbers, then references are by paragraph.

the evidence differently, most notably in connection with the testimony that the Company's witnesses gave about the threat of harm that the Company would face if its financial statements for closed periods were shared. As a result, notwithstanding the Master's well-reasoned decision, I reach a different conclusion as to whether the Company carried its burden to justify a confidentiality restriction.

## A.    The Company

The Company is a Delaware corporation with its principal place of business in Hauppauge, New York. The Company develops, manufactures, and sells computer-based television tuners, data broadcast receivers, and video capture products. The Company operates through two wholly owned subsidiaries: Hauppauge Computer Works, Inc. and HCW Distributing Corp. Both subsidiaries were incorporated in the State of New York in the 1980s. PTO ¶¶ 6–8; *see Report*, 2022 WL 203202, at *1.

Kenneth Plotkin is the Company's chief executive officer. He is a co-founder of the Company and serves as the sole member of its board of directors. Together with his wife, he owns approximately ten percent of the Company's common stock, which is its only class of equity. PTO ¶¶ 10–11; Plotkin Tr. 116–17; *see Report*, 2022 WL 203202, at *1.

Gerald Tucciarone is the Company's chief financial officer, secretary, and investor relations representative. Tucciarone has been with the Company since 1995. PTO ¶ 11; Tucciarone Tr. 165–66; *see Report*, 2022 WL 203202, at *1.

**B. The Company Accesses The Public Markets, Prospers For Years, Then Suffers Financial Reversals.**

On January 10, 1995, the Company completed an initial public offering, and its shares of common stock began to trade on NASDAQ under the symbol "HAUP." For nearly twenty years, until July 28, 2014, the Company's stock continued to trade on NASDAQ. During this period, the Company regularly made public filings with the SEC. At the same time, Plotkin and other insiders benefited from the Company's public status by selling shares through a secondary offering and in other market transactions. *See* PTO ¶¶ 1, 12–13; JX 1–2; *Report*, 2022 WL 203202, at *2.

The Company's fortunes declined in 2010 and 2011, when the Company lost sales after two large customers stopped purchasing the Company's products. By 2013, the Company's financial situation had worsened. The Company's Form 10-K for the fiscal year ending September 30, 2013 (the "2013 10K"), disclosed the risk that the Company might not continue as a going concern, explaining:

> We rely exclusively upon cash generated from operations to fund [our operating and working capital] needs. We do not have a working capital line of credit or other borrowing facility in place to draw upon in the event that cash from our operations is insufficient to fund our capital requirements to sustain our operations. Our cash and cash equivalents as of September 30, 2013 and our internally generated cash will not provide sufficient liquidity to meet our capital needs for the next twelve months, and additional sources of cash may be required to meet our capital needs. There can be no assurance that we will be able to obtain additional sources of cash if needed. The financial statements have been prepared assuming that we will continue as a going concern and do not include any adjustments that might result from the outcome of the uncertainty described here.

JX 39 at 2. Consistent with that disclosure, the Company's audited financial statements contained the following going-concern qualification: "As described in Note 1 to the

8

financial statements, the Company has suffered recurring losses and has a net capital deficiency. These conditions raise substantial doubt about its ability to continue as a going concern." JX 39 at F-2. *See generally Report*, 2022 WL 203202, at *1.

The 2013 10K also identified risk factors associated with owning the Company's common stock. As is customary, the list of risk factors was extensive, consisting of thirty-four items spanning eleven pages. 2013 10K at 16–27. At trial, the Company's counsel highlighted the following risk factors:

- "We operate in a highly competitive market, and many of our competitors have much greater resources, which may make it difficult for us to remain competitive." *Id.* at 17.

- "We rely heavily on the success of retailers, dealers and PC manufacturers to market, sell and distribute our products. If these channels are not effective in distributing our products, or if a significant customer were to cease purchasing our products, our sales could be reduced." *Id.*

- "Our largest customer is Best Buy, a consumer electronics retailer based in the United States. Sales to Best Buy accounted for 4.80% in 2013 and 10.35% in 2012. Should Best Buy cease to purchase our products, a significant percentage of our sales would be lost." *Id.*

- "We have a history of operating losses and there can be no assurance that we will be profitable in the future, nor can there be any assurances that we will be able to generate enough cash to fund operations at their current levels." *Id.* at 26.

- "We have incurred operating losses for the last six fiscal years." *Id.*

During trial, in response to questions from Company counsel, Plotkin read each of the disclosures into the record. Plotkin Tr. 88–90.

As a result of its difficulties in 2013, the Company fell below the financial requirements for trading on NASDAQ. The Company was involuntarily delisted on

9

November 15, 2013. The Company relisted on the over-the-counter (the "OTC") market, where its shares continued to trade. *See id.* at 85; *Report*, 2022 WL 203202, at *2.

## C.    The Consequences Of The Company's Poor Financial Statements

Plotkin testified that the Company suffered consequences because of the poor financial statements that appeared in the 2013 10K. Plotkin recalled that the Company lost an important sales channel and that manufacturers reduced the Company's credit lines.

On the sales front, Plotkin explained that in 2013 and 2014, the Company's most successful product was a video game recorder, and the biggest sales channel for that product was Best Buy. To maintain the relationship, Plotkin visited with a buyer at Best Buy on a quarterly basis. In January 2014, the Best Buy buyer informed Plotkin that the store no longer wanted to stock the Company's product. During the meeting, Plotkin saw a copy of the Company's 2013 10K on the buyer's desk, along with a sample of a competitor's product. There was no explicit discussion of the Company's financial statements. Soon after the meeting, Plotkin saw that the competitor's product had replaced the Company's product on Best Buy's shelves. Plotkin inferred that the competitor used the Company's poor financial statements to convince Best Buy to switch from the Company to the competitor. Plotkin Tr. 93–94; *see Report*, 2022 WL 203202, at *1.

On the manufacturing front, Plotkin and Tucciarone testified that the Company's two Asia-based manufacturers reduced its access to credit. They explained that the manufacturers used credit agencies to evaluate counterparty risk. After the agencies informed the manufacturers about the Company's financial difficulties, the manufacturers reduced the lines of credit that they provided to the Company to match the amount of credit

10

insurance that the manufacturers could obtain on the receivables owed by the Company. As the Company did less business with those manufacturers, they reduced the Company's credit further. *See* Plotkin Tr. 149–51; Tucciarone Tr. 173, 178–79, 183.

Plotkin and Tucciarone attributed both problems to the disclosure of the Company's financial statements. The real issue was the Company's *financial condition*. As Tucciarone recognized, the going-concern qualification communicated that the Company was "in dire financial shape and might not last a year." Tucciarone Tr. 173. It is understandable that the Company's counterparties wanted to reduce their exposure to a financially vulnerable firm.

## D.    The Company Deregisters.

Because of its financial difficulties, the Company explored ways to reduce its expenses. The Company's securities counsel suggested deregistering, thereby eliminating costs associated with making public filings with the SEC. Plotkin Tr. 95; *see Report*, 2022 WL 203202, at *2.

On July 28, 2014, the Company filed a Form 15 with the SEC that terminated its registration as an issuer. The Company represented that it had fewer than 300 stockholders of record and therefore was no longer subject to the mandatory reporting requirements of the federal securities laws. PTO ¶ 13; JX 47; *see Report*, 2022 WL 203202, at *2.

Plotkin testified that the risk of losing customers who might see the Company's poor financial statements played into the decision to deregister. He claimed that in addition to saving the Company money, deregistering "prevented [the Company's] bad financials from being used as a competitive tool by competitors." Plotkin Tr. 98. That testimony was not persuasive. The fact of deregistration alone, combined with a going-concern qualification

11

on the Company's most recent public financial statements, provided competitors with a rhetorical cudgel to wield against the Company if they choose. Going dark meant that the Company would not release any improved financial statements, so the informational environment would not change.

At trial, Plotkin asserted that when the Company deregistered, the plan was to "go dark for a period of time, with the goal of getting the company righted so that [the Company] could . . . start to publish [its] financials at some point in the future." *Id.* at 97; *see Report*, 2022 WL 203202, at *2. That did not happen.

Since July 28, 2014, the Company has not made any public disclosures. The Company also has not released any financial information to any stockholder. The Company has not even had an annual meeting of stockholders since 2013 or 2014. *See* Plotkin Tr. at 119, 152–54; Tucciarone Tr. 170; *see also* JX 4 at 3–4 (conversation between an investor and Tucciarone, in which Tucciarone refused to provide financial statements, claiming that doing so would violate Regulation Fair Disclosure ("Regulation FD")). *See generally Report*, 2022 WL 203202, at *2

## E.    Rivest Invests In The Company.

In 2018, Rivest purchased shares of the Company's common stock in the OTC market. The Company attempts to portray Rivest as an "ultra-sophisticated investor." Dkt. 71 at 3, 19. Rivest clearly has attained a degree of financial sophistication, but he has an atypical background and career for someone with his skillset.

Rivest does not have an MBA or other advanced degree from a fancy school. He has a high school diploma and an associate's degree in business from a community college.

12

Rivest does not have a Wall Street pedigree validated by positions at white-shoe banks or high-profile investment funds. After graduating from high school, Rivest found a job in a delicatessen. He continued working at the delicatessen for the next thirty years. It was not until he was in his forties that Rivest went to night school to complete his associate's degree. Rivest Tr. 12.

During his career in the delicatessen, Rivest did some investing on the side, and he enjoyed some success. After retiring from the delicatessen, Rivest formed an investment partnership with one other investor. He managed the partnership for ten years, ending the relationship in 2011. *See generally* JXs 57–59 (background information about Rivest's investment partnership) . He is now fully retired and only manages his own money. *See id.* at 12–13, 21.

At trial, Rivest explained that his investment partnership pursued two basic investment strategies. One was "deep value" investing, in which he sought to buy shares trading well below his estimate of their fair value. The other was special situation investing, where the investment catalyst was a spin-off, tender offer, or bankruptcy. *See id.* at 20; *See Report*, 2022 WL 203202, at *2. Neither strategy is particularly unique; both are well known and widely employed.

Rivest is plainly knowledgeable about investments, and he deserves credit for putting in the work to acquire that knowledge. But he is largely self-taught, and he has limited formal education. He is a self-described "common man" who has gained experience over the years. *See* JX 62 at 2 ("[W]hile I invest in the OTC space, I don't know all the ins and outs like the professionals, lawyers and broker-dealers commenting. My view will

13

simply be that of a common man—a common-sensical retired investor who happens to sometimes find gold in the illiquid OTC space. I managed a deli for decades but have always been drawn to investment bargains and I have found them in OTC Land."). Contrary to the Company's claims, he is not an ultra-sophisticated investor.

Rivest purchased the Company's shares after researching the Company on a blog devoted to dark companies that trade on the OTC markets. Rivest Tr. at 22; *see* JX 4. He looked at the Company's old SEC filings, noted that the Company had "good sales years ago," and reasoned that even at that level of performance, the Company was "incredibly cheap." Rivest Tr. 24. He viewed the Company as a "'deep value' investment." *Id.* at 50. *See generally Report*, 2022 WL 203202, at \*2.

Rivest has invested in other OTC companies as well. He typically buys a few shares of a corporation's stock, then sends a Section 220 demand to the corporation seeking financial information. Rivest Tr. 26–27; *see Report*, 2022 WL 203202, at \*2.

## F.    Rivest Seeks Books And Records.

On July 29, 2019, Rivest mailed the Company a demand to inspect its books and records for the purpose of valuing his shares. The Company did not respond. Plotkin testified that he had no record of receiving the demand, but he admitted that it was possible that the Company received it. Plotkin Tr. 120–21. Rivest testified that he received a return receipt, signed by Plotkin, although he no longer has it. Rivest Tr. 28–29. The Master did not recommend a finding on this issue. Having taken into account the witnesses' credibility and the Company's pattern of gamesmanship throughout this proceeding, I credit Rivest's testimony.

14

After the Company failed to respond to his demand, Rivest retained counsel. On October 8, 2019, Rivest's lawyer sent the Company a second demand. JX 8 (the "October 2019 Demand"). Rivest asked to inspect just two categories of books and records:

> (1) Monthly, quarterly and annual financial statements and financial reports, including income statements, balance sheets, statements of cash flow and all similar documents for the Company for the years 2016, 2017 and 2018.

> (2) Appraisals, valuations or analyses mentioning or otherwise referring to or relating to the value of the Company, its stock or any of its assets.

*Id.* at 2. The October 2019 Demand stated that Rivest was seeking the documents for the purpose of valuing his shares. *Id.*

Just as the Company failed to respond to Rivest's initial demand, the Company failed to respond to the October 2019 Demand. Plotkin Tr. 121. *See generally Report*, 2022 WL 203202, at *2.

## G.    The Filing Of This Litigation And The Default Judgment

On October 24, 2019, Rivest filed this action. The summons was served on October 25, 2019. The Company did not respond to the summons.[2]

On December 4, 2019, Rivest moved for a default judgment. The Company did not respond to the motion. *See* Dkt. 6; *Report*, 2022 WL 203202, at *4.

---

[2] *See* Dkts. 1–2; *Report*, 2022 WL 203202, at *4. In the pre-trial order, the Company asserted that it would prove at trial that "Defendant attempted to negotiate confidentiality with Plaintiff before this Action was commenced." PTO ¶ 29. The Company did not contact Rivest or his counsel until after the default judgment was entered.

On April 24, 2020 at 9:50 a.m., the Master granted the motion and entered judgment against the Company. Hours later, at 2:30 p.m., the Master received a letter from Plotkin, who purported to represent the Company *pro se*. Plotkin sent the letter on April 21, 2020, a day after the Master's deadline for responding to the motion for default judgment, and he sent the letter by regular mail. *See* Dkts. 11 & 13; *Report*, 2022 WL 203202, at *4.

Plotkin described the Company as "a public corporation" whose stock traded on the OTC market. Dkt. 12 at 1. Plotkin asserted that Rivest was "asking the Company to disclose material, nonpublic financial information, information which is not required to be disclosed by the SEC after the filing of Form 15." *Id.* at 2. Plotkin argued that because the Company's shares continued to trade, Rivest did not need books and records to value his shares: "[H]e can simply look at the daily price." *Id.* at 3. At the time, trading in the Company's stock was virtually nonexistent. It was not a thick and informed market that could provide a reliable price.

Plotkin also argued that if the Company provided nonpublic information to Rivest, then he "would have inside financial information on the Company, information not commonly known by other shareholders," which would give Rivest "a leg up on other shareholders." *Id.* By making this argument, Plotkin sought to invoke Regulation FD, which was adopted to prevent selective disclosure of information by public companies. *See* Selective Disclosure and Insider Trading, 65 Fed. Reg 51716-01 (Aug. 24, 2000); *see also* 17 CFR § 243.100 ("Whenever an issuer, or any person acting on its behalf, discloses any material nonpublic information regarding that issuer or its securities to [certain listed] person[s] . . . the issuer shall make public disclosure of that information . . . .").

16

Notably, Plotkin did *not* assert that the Company would suffer any harm due to the disclosure of the financial information that Rivest sought. He relied on other rationales.

On May 5, 2020, the Master received an additional letter from Plotkin, in which he conveyed that he was "disappointed [that] the Court did not acknowledge" his prior letter. Dkt. 17 at 1. Plotkin represented that the Company would produce the documents that Rivest sought "as long as there is a reasonable Non Disclosure Agreement." *Id.* He explained:

> Our reason to ask for a Non Disclosure Agreement covering the release of these confidential documents is simple: the public release of this financial information we believe will have a detrimental impact on our business. Our company has been undergoing severe financial strain, and we believe that the public release of the financial condition of the Company will cause a loss of confidence among our customers and result in a loss of business, which will cause further strain on our company.

*Id.* at 2. That was the first time that Plotkin expressed concern that the Company would suffer harm from disclosing information.

On May 7, 2020, Rivest responded to Plotkin's letters. Dkt. 15. Rivest correctly noted that Plotkin had not provided any reason for not responding to the complaint in a timely manner. *Id.* at 1. He also observed that Plotkin was attempting to represent a Delaware entity *pro se*. *Id.* at 2. Rivest then addressed each of the points made in Plotkin's letters. *Id.* at 3–9.

By letter dated May 13, 2020, the Master informed Plotkin that a corporation could only appear through a licensed attorney. The Master gave the Company ten days to retain Delaware counsel and file a response to the motion for default judgment. Dkt. 18. Plotkin had represented that he had already hired Delaware counsel. *See* Dkt. 17 at 2.

17

Notwithstanding that representation, Plotkin asked to have until June 15, 2020 to file a response. Dkt. 19. On May 27, 2020, the Company's current counsel appeared. Dkt. 21. The Master granted an extension until June 8, 2020. Dkt. 22.

On June 9, 2020, the Company filed a motion for relief from default judgment. The motion asserted that Plotkin had delegated the responsibility of responding to Rivest to an employee who was subsequently furloughed due to the COVID-19 pandemic. Dkt. 23 ¶¶ 19–20. At trial, Plotkin testified that he was the one responsible for responding to lawsuits at the Company. Plotkin Tr. 83. According to the motion, Plotkin believed he was complying with the court's deadline by sending a letter via regular mail on the day after the deadline. Dkt. 23 ¶ 10.

The motion argued that the Company had the following valid basis to seek confidential treatment of the documents that Rivest sought:

> Unbeknownst to Plaintiff, industry competitors of [the Company] have, in the past, weaponized poor performance displayed on financial statements, as well as representations alluding to or summarizing that information, causing a loss in business with reputable, large-scale sale platforms including Best Buy for audio-visual and technology products. The books and records sought in this action are non-public, containing similarly sensitive information, where public disclosure could result in further competitive disadvantage, business loss and irreparable harm.

*Id.* ¶ 15 (footnote omitted).

On August 3, 2020, the Master recommended vacating the default judgment. She generously attributed the Company's failure to respond to the complaint to the uncertainty created by the COVID-19 pandemic, and she found that the Company's neglect in responding to the complaint was excusable. She also found that the Company had cited

18

sufficient authority and evidence to raise a litigable issue regarding confidentiality. Dkt. 28. This court approved the Master's recommendation and adopted the report. Dkt. 29.

While these events were unfolding, on April 24, 2020, Rivest sent an additional demand to inspect the Company's books and records for the purpose of valuing his shares. JX 10 (the "April 2020 Demand"). That demand sought the same books and records as his earlier demand, but for 2019 and 2020. Rivest explained at trial that considerable time had passed since his original demands, and he was seeking more recent information. Rivest Tr. 32. *See Report*, 2022 WL 203202, at *2–3.

Plotkin claimed at trial that the Company responded to the April 2020 Demand. Plotkin Tr. 122. The only letter that Plotkin sent addressed the default judgment that the Master entered. *See* JX 12. The substance of the letter did not reference the April 2020 Demand in any way. Plotkin Tr. 122–23. Contrary to Plotkin's testimony, the Company never responded to the April 2020 Demand.

## H.     The Litigation Unfolds.

The Company filed its answer on September 1, 2020. Dkt. 30. The Company denied that it had failed to respond to the October 2019 Demand, claiming that an admission would constitute a legal conclusion. *See id.* ¶¶ 11, 19. The Company denied that the October 2019 Demand complied with the form and manner requirements under Section 220. *See id.* ¶ 17. The Company denied that the October 2019 Demand stated a proper purpose. *See id.* ¶ 18. And the Company raised a series of affirmative defenses, including: (i) the failure to state a claim on which relief can be granted, (ii) "the doctrines of waiver, estoppel, and/or abandonment," (iii) unclean hands, (iv) "subject matter jurisdictional limitations and/or the

19

supremacy doctrine," and (v) the contention that the lawsuit was "brought for an improper purpose to harass [the Company], needlessly increase the costs of this litigation, cause injury to [the Company] by unfairly aiding market competitors of [the Company] and/or circumvent Federal law." *Id.* at 9–10. The Company reserved the right to assert other affirmative defenses. *Id.* at 10.

The parties engaged in document discovery. On April 21, 2021, the Master entered a stipulated case scheduling order that would bring the case to trial on October 26, 2021. Dkt. 36; *see Report*, 2022 WL 203202, at *5.

On August 17, 2021, Rivest moved to supplement his pleading and add the April 2020 Demand to the litigation. Dkt. 39. On September 17, 2021, the Company filed a combined response that both opposed the motion to amend and constituted a cross-motion for summary judgment. Dkt. 40.

In its combined motion, the Company claimed that Rivest could not establish a proper purpose as a matter of law because he was "abusing his Section 220 right to manipulate this Court into compelling disclosure by a non-public, delisted Delaware corporation, which will then empower some stock broker-dealer [sic] to exploit an exception in a newly amended Rule of the Securities and Exchange Commission." *Id.* ¶ 3. That was a reference to Rule 15c2-11, titled "Publication or Submission of Quotations without Specified Information." 17 C.F.R. § 240.15c2-11 (the "Quotation Rule").

The Company's combined motion was the first time anyone in the case had raised the Quotation Rule. The SEC amended the Quotation Rule through a process of notice-and-comment rulemaking that began two years earlier with a notice dated September 25,

20

2019. The SEC issued a final notice of rulemaking on October 27, 2020. *See* Publication or Submission of Quotations Without Specified Information, 85 Fed. Reg. 68124 (Oct. 27, 2020) ("Final Notice"). The new rule became effective on December 28, 2020, with a compliance date of September 28, 2021. *See generally Report*, 2022 WL 203202, at *3–4.

No one raised the Quotation Rule at any of these earlier points. Company counsel later acknowledged that he learned about the Quotation Rule from his client shortly before filing the combined motion. Dkt. 61 at 13.

Because the Company made the Quotation Rule a focus of its arguments, it is necessary to understand what the rule accomplishes. The purpose of the Quotation Rule is to "promote investor protection by providing greater transparency to the investing public regarding issuers of OTC securities," "facilitate capital formation for issuers for which information is current and publicly available," and "reduce unnecessary burdens on broker-dealers and enhance the efficiency of the OTC market." Final Notice at 68125.

The Quotation Rule seeks to accomplish these goals by imposing certain requirements before any broker-dealer or qualified interdealer quotation system (jointly, "Market Makers") can provide a quotation for a security trading in the OTC market. *Id.* at 68124. The "information review requirement" prohibits a Market Maker from publishing a quotation unless the Market Maker has obtained and reviewed certain current and publicly available information about the issuer. 17 C.F.R. § 240.15c2-11(a)(1)(i)(B), (a)(2)(ii), (b)(5)(i), (b)(5)(ii).

The specific information that a Market Maker must obtain and review depends on the regulatory status of the issuer. An issuer that is not otherwise subject to disclosure and

21

reporting requirements under the federal securities laws is a "Catch-All Issuer." Final Notice at 68129. The Company is a Catch-All Issuer.

To publish a quotation for securities of a Catch-All Issuer, a Market Maker must obtain basic information about the company, including its name and address, a description of its business, and the par or stated value of the security to be traded. The Market Maker also must obtain and review a complete list of insiders, the most recent balance sheet, and profit and loss and retained earnings statements. 17 C.F.R. § 240.15c2-11(b)(5)(i). Unless otherwise specified, a Catch-All Issuer's information is considered "current" if it is accurate within twelve months of the publication of the quotation (the "Current Information Requirement"). *Id.* There are a few exceptions to the Current Information Requirement, one of which is pertinent: To be "current," a balance sheet must be prepared less than sixteen months before the publication or submission of the quotation. *Id.* § 240.15c2-11(b)(5)(i)(L). The issuer's profit and loss and retained earnings statements must be those from "the 12 months preceding the date of the most recent balance sheet." *Id.*

A Catch-All Issuer's information is considered "publicly available" if it is available on EDGAR or "on the website of a state or federal agency, a qualified interdealer quotation system, a registered national securities association, an issuer, or a registered broker or dealer." *Id.* § 240.15c2-11(e)(5). Information is not "publicly available" if access is restricted by "user name, password, fees, or other restraints." *Id.*

The Quotation Rule does not require a Market Maker to obtain the issuer's information from the issuer itself. Instead, a Market Maker must have "a reasonable basis under the circumstances for believing" that the information is accurate and from a reliable

22

source. *Id*. § 240.15c2-11(a)(1)(i)(C), (a)(2)(iii). By its terms, the Quotation Rule only regulates Market Makers. It does not impose any requirements on corporations. *See id.* § 240.15c2-11(a)(1)–(2).

Every Market Maker does not have to satisfy the information review requirement. There is a "piggyback exception," which "allows a broker-dealer to rely on the quotations of another broker-dealer that initially complied with the information review requirement . . . so long as there are no more than four business days in succession without a [compliant] quotation." Final Notice at 68126; *see also* 17 C.F.R. § 240.15c2-11(f)(3).

Through the Quotation Rule, the SEC sought to provide greater transparency and protection to retail investors who trade in the OTC market:

> Securities that trade in the OTC market are primarily owned by retail investors. Many issuers of quoted OTC securities publicly disclose current information about themselves. However, in other cases, there is no or limited current public information available about certain issuers of quoted OTC securities to allow investors or other market participants to make informed investment decisions. A lack of current and public information about these companies disadvantages retail investors because it may prevent them from estimating return probabilities and generating positive returns in OTC stocks. It can contribute to incidents of fraud and manipulation by preventing retail investors from being able to counteract misinformation.

Final Notice at 68125 (footnotes omitted). The Quotation Rule thus creates a system in which Market Makers can provide quotations only if a minimum level of information is available. Through this mechanism, the SEC sought to cement the role of Market Makers as gatekeepers to the OTC market. *Id.* at 68135.

Recall that the Company has not made any public disclosures or released any financial information since July 28, 2014. The adoption of the Quotation Rule meant that

23

after September 28, 2021, Market Makers could not provide public quotations or facilitate trading in the Company's common stock. Market Makers could continue to provide unsolicited quotations and facilitate trading in the OTC "Expert Market," but only broker-dealers and other institutional investors are permitted to view those quotations.[3]

Ninety percent of the Company's stockholders are retail investors. Plotkin Tr. 117–18. Because the Company has not disclosed any information since July 28, 2014, ninety percent of the Company's stockholders have not been able to trade their shares since the Quotation Rule went into effect.

## I.     The Litigation Proceeds To Trial.

On September 21, 2021, the Master entered two orders. The first order granted the motion to amend and supplement the pleadings. Dkt. 42. The second order denied the motion for summary judgment without prejudice. Dkt. 41. In both cases, the Master held that the interests of justice would be best served by a full adjudication of the parties' disputes at trial. Rivest filed his supplemented complaint on September 27, 2021. Dkt. 45.

By court order, the parties' pre-trial briefs were due by 2:00 p.m. on October 8, 2021. Dkt. 49. At 12:47 p.m. on that date, the Company filed a document titled, "Emergency Motion to Amend the Scheduling Order, for Relief from Order, or, in the

---

[3] *See* Cass Sanford, *Understanding the Expert Market*, OTC Markets Blog (Mar. 25, 2021), https://blog.otcmarkets.com/2021/03/25/understanding-the-expert-market; *see also* Final Notice at 68145, 68186 n.646. "Unlike the [g]rey [m]arket—where this is no public quote at all—the Expert Market provides additional price transparency, as it allows for unsolicited quoting." Sanford, *supra*..

Alternative, to Continue Trial." Dkt. 50 (the "Emergency Motion"). The Company claimed that Rivest had engaged in discovery misconduct by failing to produce documents relating to the Quotation Rule and asked for a continuance so that the Company could renew and fully brief its motion for summary judgment. *Id.*

The gist of the Company's argument was that during the notice-and-comment rulemaking process for the Quotation Rule, Rivest submitted a comment letter. JX 7. Rivest's letter criticized the proposed Quotation Rule because it would prevent retail investors from trading in certain OTC stocks, and he argued that the SEC should not adopt it.[4] Rivest maintained that if corporations were not providing sufficient information to support informed trading by retail investors, then the answer was for the SEC to require that dark companies provide sufficient information, such as by posting annual financial statements on their websites. *See* Rivest Tr. 60–61.

---

[4] *See* JX 7 at 1 (arguing that "[t]he proposed rule would be a disaster for investors who invest in legitimate OTC companies that provide little to no public information"); *id.* at 2 (arguing that participants in the OTC market understood the prevailing principle of caveat emptor); *id.* (arguing that the Quotation Rule would cut off retail investor access to the OTC markets and constitute a "draconian solution to combatting the fraudulent and manipulative schemes targeting retail investors").

The Company points out that Rivest did not mention this litigation or his holdings in the Company in his comment letter. Rivest submitted his comment on September 29, 2019, one month before filing this litigation. He understandably did not mention a proceeding that did not yet exist. He admittedly did not specifically reference his holdings in the Company, but he made clear that he invested in companies that had gone dark, and cited investments in three dark issuers. *See generally id.* Despite the Company's effort to paint Rivest's comment letter as misleading, there is nothing misleading or inappropriate about it. Reasonable minds could disagree about the wisdom of the proposed Quotation Rule. Rivest advanced credible arguments against the Quotation Rule.

In its Emergency Motion, the Company asserted that by failing to produce documents relating to the Quotation Rule, Rivest had "*withheld* documents responsive to discovery requests and otherwise subject to production." Dkt. 50 ¶ 2. The Company claimed that "[t]he undue prejudice and unfair surprise upon [the Company], as intentionally <u>calculated</u> by Plaintiff, is so severe as to make adherence to the current Trial Scheduling Order impossible." *Id.* ¶ 3.

As telegraphed in the Emergency Motion, the Company did not file its pretrial brief as required by the scheduling order. In fact, the Company *never* filed a pretrial brief. Rivest, by contrast, filed his pretrial brief as required by the scheduling order. Dkt. 51.

During the pre-trial conference on October 14, 2021, the Master denied the Emergency Motion. Dkt. 60 at 35. The Master accurately noted that the Company had not requested any documents relating to the Quotation Rule, so Rivest had no obligation to produce those documents. *Id.* at 35–37. The Master also found that the Company had not been prejudiced and had adequate time to prepare for trial. *Id.* at 35. The Master reasoned that to the extent there was any prejudice to the Company, it was minimal and outweighed by the interest of Rivest and the court in proceeding to trial. *Id.* at 37. In reaching this conclusion, the Master noted that *two years* had passed since Rivest had served the October 2019 Demand and filed the litigation. *See id.*

The Master also denied an application that the Company made to seal the courtroom during the evidentiary hearing, while at the same time designating both of its fact witnesses—Plotkin and Tucciarone—as corporate representatives so that they could attend the entire trial and not be sequestered. The Master correctly concluded that such an

26

approach was unnecessary and unfair. *Id.* at 71, 77, 85–86. The Master also dealt with evidentiary issues that the Company raised through oral motions in *limine*. *See id.* at 97–98.

**J.      The Trial**

The Master held a one-day trial on October 26, 2021. Dkt. 61. As noted, the trial was recorded to facilitate *de novo* review by a constitutional judge if exceptions were taken.

In an effort to simplify the issues for decision, Rivest limited his request to historical financial statements for closed periods. Rivest withdrew his request for appraisals or other valuation-related documents, such as projections or forecasts.

During the trial, Plotkin asserted hyperbolically that any public disclosure of the Company's financial statements "would be a disaster." Plotkin Tr. 102. Asked to elaborate, he testified:

> Yeah, I think it could—as I said, difficult to determine in advance what will happen. But if the confidential financial information was given to somebody and that information eventually became public, and one of our competitors shared that information with some of our current largest customers, and we lost yet another company like Best Buy, basically, I think we would have to close the company. I think, at this point, we've got a couple of great customers but if we lost one of them, we just wouldn't be able to stay in business.

*Id.* at 103. He reiterated that any public disclosure of the Company's financial statements "would be a disaster for the company" and "have a catastrophic effect on the company."[5]

---

[5] Dkt. 61 at 104; *see id.* at 119 (testifying that disclosure would have "a dramatic negative effect on the Company"); *id.* at 146–47 (testifying that disclosure of the Company's financial statements "could potentially put the company out of business"); *id.*

27

That level of existential angst about financial statements only makes sense if the financial statements contain adverse information comparable to the going-concern qualification in the financial statements in the 2013 10K.

Other than the incidents involving Best Buy no longer stocking the Company's product and the Company's manufacturers reducing its trade credit, Plotkin could not recall any other instance in which the Company's disclosure of financial statements had hurt its business. Plotkin Tr. 149–51. Tucciarone also could not recall any specific incidents other than those two events from nearly a decade ago. Instead, he testified to a general concern about the competitive nature of the Company's business:

> Look, we live in a pretty competitive environment. And, basically, it's like a jungle out there in our industry. And, honestly, you know, if a competitor— if a competitor could get its hands on information that shows that the company is doing very poorly, I mean, I know— I don't want to sound like a bad person, but I know that if we got that information, we would use it against one of our competitors. So I imagine that they would probably use it, too.

Tucciarone Tr. 184.

Tucciarone also asserted generally that the Company was vulnerable as a result of the pandemic.

> I mean, the pandemic has hit us pretty hard. We've had supply disruptions going back to February 2020, production disruptions going back to 2020.

at 147 ("If this public—if this confidential financial information becomes public, there is the risk that the company will go out of business"); *id.* at 147–48 ("I believe that if we release to the public on the internet our confidential financial information, it will have a harmful effect on the company that could potentially put us out of business"). The Company's counsel asserted that disclosing the Company's financial statements "poses an existential threat" and that "[t]he company may cease to exist." *Id.* at 231.

And now we've got the issue with a major microchip shortage. So the company, as opposed to last year—this is a very delicate situation due to the pandemic.

Tucciarone Tr. 186. Rivest objected to this testimony, noting that it constituted testimony about the contents of the financial statements. Rivest had not been entitled to obtain those documents and thus had no way to respond. *Id.* at 187–92.

During his testimony, Plotkin would not say whether the public markets were entitled to know the financial condition of the Company. Plotkin Tr. 139. He asserted that since its founding in 1995, the Company has maintained a policy of only providing confidential information subject to a non-disclosure agreement that contained a standstill restriction. *Id.* 110–11. He noted that this was "usually in the case of merger and acquisition discussions." *Id.* He asserted that the Company's policy required five years of confidentiality. *Id.* at 128–29. The only confidentiality agreement that the Company proposed to Rivest contemplated indefinite confidentiality. *Id.* 158–59.

Both Plotkin and Tucciarone insisted that the Company needed a confidentiality agreement to avoid running afoul of Regulation FD. *Id.* 111–12; Tucciarone Tr. 170. Starting with Plotkin's first letter to the Master, the Company relied on Regulation FD as a basis for resisting Rivest's inspection request.

Because the Company had deregistered, Regulation FD does not apply to the Company. *See* JX 42 at 3; PTO ¶ 13. Plotkin did not know that. Plotkin Tr. 112–14.

29

### K. The Master's Report

On January 24, 2022, the Master issued the Report. To reiterate, it is careful, thorough, and thoughtful, and it exemplifies the consistently high quality of the work product that the Masters of this court generate.

After reviewing the evidence and considering the parties' arguments, the Master recommended a finding that Rivest had a proper purpose in seeking to inspect the Company's books and records to value his holdings. She noted that Rivest's need was heightened by the fact that the Company does not make public disclosures or disclosures to stockholders. *Report*, 2022 WL 203202, at *6. No one has taken exceptions to that recommendation, which is therefore adopted as a ruling of this court.

In reaching her recommendation that Rivest be found to have a proper purpose, the Master considered the Company's argument that Rivest's actual purpose is "to circumvent or unfairly take advantage of the [Quotation Rule] and to share information with the marketplace for his personal profit at the Company's expense." *Id.* at *7 (cleaned up). She recommended a contrary finding on the grounds that that the evidence did not support the Company's position. Instead, she recommended a finding that Rivest only intended to share the Company's financial information as part of the process of determining the value of the Company's stock, and only if it was legal for him to do so. *Id.* She noted that such a plan was not improper and instead confirmed that Rivest's actual purpose was "to assess the market value of the Company's stock." *Id.* No one has taken exceptions to that recommendation, which is therefore adopted as a ruling of this court.

30

The Master then turned to whether to impose a confidentiality restriction on the information that Rivest sought. She first considered the evidence regarding the implications of a confidentiality restriction for Rivest and recommended a finding that Rivest "has an interest in being able to share the information he learns from the inspection with other investors who may be interested in purchasing his holdings in the Company's stock." *Id.*, at *9. At the same time, the Master recommended that the court not give any weight to Rivest's argument that a confidentiality restriction would interfere with his ability to provide the financial statements to a Market Maker. *Id.* She acknowledged that a public quotation might create a benefit for Rivest and other stockholders, but posited that "this Court does not craft use and confidentiality restrictions on a Section 220 production based upon the rights and restrictions found in federal securities laws." *Id.*

The Master then considered the evidence regarding the potential harm to the Company if its financial statements became public. She reviewed the evidence indicating that the going-concern qualification on the Company's financial statements in the 2013 10K had led to the loss of a sales channel with Best Buy and the reduction in trade credit, and she summarized the testimony by Plotkin and Tucciarone. She noted that the evidence of harm to the Company was "limited." *Id.* She nevertheless recommended that the court find that "should the Company's current nonpublic financial information fall into the hands of a competitor, the Company may well face harm." *Id.* Rivest takes exception to this recommendation and contends that the Company's evidence is insufficient to support a confidentiality restriction.

31

Weighing the parties' arguments, the Master recommended that the court impose a two-year confidentiality restriction. In other words, she recommended that any financial statements for closed periods that were more than two years old would not be subject to any confidentiality restriction. She recommended that more recent financial statements be subject to a confidentiality restriction that would prevent Rivest from sharing them. Rivest takes exception to this ruling, maintains that it interferes with his ability to value his shares, and contends that the Company's evidence was insufficient to support a two-year confidentiality restriction.

## L.     The Exceptions

On February 4, 2022, Rivest took exceptions to the Report in accordance with Court of Chancery Rule 144(c). Dkt. 63. Rivest asserted that "[t]he Report's conclusion that confidential treatment is warranted to inspect the quarterly and annual financial statements of [the Company], a publicly traded company of which 90% of the shares outstanding are held in the public market, is unsupported by policy, law and fact." *Id.* The Company did not take exception to the Report.

## II.     LEGAL ANALYSIS

When the Court of Chancery considers exceptions to a Master's final report, the court must conduct a *de novo* review of both the facts and law. Ct. Ch. R. 144(a); *DiGiacobbe*, 743 A.2d at 184. As I have noted, the Master did an excellent job handling this case. The Company was an obstreperous litigant, and she exhibited great patience in addressing the Company's various motions and objections. She considered the evidentiary

32

record with care. She examined the legal issues thoroughly and made reasonable recommendations.

Evidencing the quality of the Report, the only exceptions concern whether the Company carried its burden to establish that its financial statements for closed periods warrant the protection of a confidentiality restriction. The Company sought an indefinite confidentiality restriction. Rivest argued for no confidentiality restriction. The Master recommended a two-year confidentiality restriction.

The Master's recommendation reflects a reasonable approach and one understandable view of the evidence. If I were conducting a deferential review, then I would overrule the exception and adopt the Master's recommendation.

Under a *de novo* standard, however, I must review the evidence anew and consider the competing arguments afresh. In my view, the Company failed to carry its burden of showing that a confidentiality restriction is warranted for its financial statements for closed periods. I therefore grant the limited exceptions that Rivest asserted.

## A. The Role Of Section 220 Under Delaware Law

Section 220(b) of the DGCL grants "[a]ny stockholder" the right "to inspect for any proper purpose . . . [t]he corporation's stock ledger, a list of its stockholders, and its other books and records . . . ." 8 *Del. C.* § 220(b). "Section 220 is now recognized as 'an important part of the corporate governance landscape.'" *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 120 (Del. 2006) (quoting *Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 571 (Del. 1997)).

A stockholder's right to inspect books and records is a qualified one. *Cent. Laborers Pension Fund v. News Corp.*, 45 A.3d 139, 143 (Del. 2012). To obtain books and records under Section 220(b), a plaintiff must establish by a preponderance of the evidence (i) its status as a stockholder, (ii) compliance with the statutory requirements for making a demand, and (iii) a proper purpose for conducting the inspection. *Id.* at 144 (listing the three requirements); *Sec. First Corp.*, 687 A.2d at 565 (ruling on the evidentiary standard). These statutory requirements are known as the "form and manner requirements." *NVIDIA Corp. v. City of Westland Police & Fire Ret. Sys.*, 2022 WL 2812718, at *6 (Del. July 19, 2022, revised July 25, 2022).

After meeting the form and manner requirements, the stockholder must demonstrate by a preponderance of the evidence that "each category of the books and records requested is essential and sufficient to [its] stated purpose." *Thomas & Betts Corp. v. Leviton Mfg. Co.*, 681 A.2d 1026, 1035 (Del. 1996). The stockholder should receive "access to all of the documents in the corporation's possession, custody or control, that are necessary to satisfy [the plaintiff's] proper purpose." *Saito v. McKesson HBOC, Inc.*, 806 A.2d 113, 115 (Del. 2002). In sum, "the court must give the petitioner everything that is 'essential,' but stop at what is 'sufficient.'" *KT4 P'rs v. Palantir Techs. Inc.*, 203 A.3d 738, 752 (Del. 2019) (cleaned up).

There is no dispute about Rivest's status as a stockholder. *Report*, 2022 WL 203202, at *5. There is no dispute about Rivest's compliance with the form and manner requirements. *Id.* There is no dispute about the limited scope of the inspection that Rivest seeks. *Id.* No one has taken any exception to the Master's recommended finding about

34

Rivest having a proper purpose for seeking inspection. Accordingly, there is no dispute that Rivest is seeking an inspection for the *bona fide* and proper purpose of valuing his shares. The only dispute concerns one aspect of the Master's recommendation: Whether the Company carried its burden to impose a confidentiality restriction on the most recent two years of financial statements.

## B. The Implications of *Tiger*

"[T]he Court of Chancery is empowered to place reasonable confidentiality restrictions on a Section 220 production." *Tiger*, 214 A.3d at 937. In the *Tiger* decision, the Delaware Supreme Court held that "although the Court of Chancery may—and typically does—condition Section 220 inspections on the entry of a reasonable confidentiality order, such inspections are not subject to a presumption of confidentiality." *Id.* at 935. By providing this clarification, the high court overruled language in a line of cases traceable to *Disney v. The Walt Disney Co.*, 857 A.2d 444 (Del. Ch. 2004). In that decision, this court had remarked that there is a "presumption that the production of nonpublic corporate books and records to a stockholder making a demand pursuant to Section 220 should be conditioned upon a reasonable confidentiality order."[6]

---

[6] *Id.* at 447. A series of subsequent decisions relied on *Disney* for this proposition. *See, e.g.*, *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 797 (Del. Ch. 2016), *abrogated in part on other grounds by Tiger*, 214 A.3d 933 (Del. 2019); *Schnatter v. Papa John's Int'l, Inc.*, 2019 WL 194634, at *17 (Del. Ch. Jan. 15, 2019), *abrogated in part on other grounds by Tiger*, 214 A.3d 933 (Del. 2019); *Elow v. Express Scripts Hldg. Co.*, 2017 WL 2352151, at *7 n.80 (Del. Ch. May 31, 2017), *abrogated in part on other grounds by Tiger*, 214 A.3d 933 (Del. 2019); *Rodgers v. Cypress Semiconductor Corp.*, 2017 WL 1380621,

The *Tiger* decision made clear that no presumption of confidentiality exists. Instead, the court "must assess and compare benefits and harms when determining the initial degree and duration of confidentiality."[7] "The risk of harm, of whatever nature, must be evaluated on the basis of magnitude and likelihood . . . ." *Amalgamated Bank v. UICI*, 2005 WL 1377432, at \*5 (Del. Ch. June 2, 2005). In assessing the need for confidential treatment, this court will consider confidentiality restrictions based on the fact-specific circumstances of each case. *See KT4 P'rs*, 203 A.3d at 748.

The question in this case is whether the Company's showing regarding the threat of harm outweighs Rivest's interest in using the Company's financial statements to value his shares. The parties have made a series of arguments, which this decision analyzes by grouping them into categories.

---

at \*6 (Del. Ch. Apr. 17, 2017), *abrogated in part on other grounds by Tiger*, 214 A.3d 933 (Del. 2019).

[7] *Tiger*, 214 A.3d at 939 (footnote omitted). The decision in *Radwick Pty., Ltd. v. Medical, Inc.*, provides an example of the Court's efforts to balance the competing interests of a company and its stockholder. 1984 WL 8264 (Del. Ch. Nov. 7, 1984). The plaintiff sought inspection of the corporation's financial statements for the purpose of ascertaining the value of its shares. The corporation responded in part that the disclosure of such information would likely jeopardize ongoing and sensitive negotiations with acquisition candidates and result in harm to the corporation. While considering the competing interests, the court conducted a fact-intensive analysis of the specific needs and concerns of each of the parties as to each category of information at issue. *Id.*, at \*3. This decision employs the same careful consideration of the categories of information Rivest requests, and the concerns and needs of each of the parties.

## 1.     Factors Associated With The Company

Rivest starts by arguing that when considering whether a corporation has carried its burden to establish the need for a reasonable confidentiality restriction, the court should take into account the attributes of the company producing the books and records. One pertinent attribute is whether the company is publicly traded, publicly registered, private with many stockholders, or private with few stockholders. Rivest reasons that a publicly traded or publicly registered corporation that regularly makes filings with the SEC presents one set of considerations,[8] while a privately held corporation presents a different set of considerations.[9] Even within the privately held space there are distinctions. A unicorn with

---

[8] For example, "[a] stock holding in a large publicly traded corporation may not require any disclosure of books and records as the litigants may use the market price as a gauge of value." *Pet. of B & F Towing & Salvage Co., Inc.*, 551 A.2d 45, 51 (Del. 1988); *see Marathon P'rs, L.P. v. M&F Worldwide Corp.*, 2004 WL 1728604, at *8, *10 (Del. Ch. July 30, 2004) (denying inspection where the plaintiff failed to demonstrate why the publicly available information was insufficient to value its shares). In addition, "public filings typically provide significant financial information about the company, and inspection rights are narrowly tailored to address specific needs. The Court will limit or deny any inspection to the extent that the requested information is available in a corporation's public filings." *Holman v. Nw. Broad., L.P.*, 2007 WL 1074770, at *2 (Del. Ch. Mar. 29, 2007); *see Polygon Glob. Opportunities Master Fund v. W. Corp.*, 2006 WL 2947486, at *4 (Del. Ch. Oct. 12, 2006) (denying inspection because the company "appear[ed] to have disclosed all material information necessary for [the plaintiff] to determine whether or not to seek appraisal" where the company had made extensive disclosures "[t]hrough its preliminary and final proxy materials, and its Schedule 13E-3, and amendments").

[9] For example, conducting an inspection for valuation purposes is all the more pertinent "when the corporation is closely held, its shares are not publicly traded, and no readily available index of their value exists." *Ostrow v. Bonney Forge Corp*, 1994 WL 114807, at *11 (Del. Ch. Apr. 6, 1994). Stockholders of those companies "do not have access to the same quantity of information available from the regulatory filings of publicly

37

many stockholders, a billion-dollar valuation, and a significant market presence implicates different considerations than a small, family-held business with few stockholders.

The Company seeks to be treated as if it were a privately held corporation, but Rivest correctly observes that the Company took a different path. The Company chose to access the public markets and accept outside financing from public investors, including retail investors. Although the Company subsequently deregistered and is currently dark, retail investors continue to hold ninety percent of its shares. The Company is not an entity that has consistently preserved its status as a private entity. Nor did the Company build confidentiality restrictions into its constitutive documents.

Relying on *Southpaw*, the Company argues that its status as a dark entity entitles the Company to treat its financial statements as confidential. The *Southpaw* decision bears some superficial similarities to the case, and the Company relies on it repeatedly. But there are important distinctions that render the *Southpaw* decision unpersuasive.

In *Southpaw*, the plaintiff-stockholder (Southpaw) sought to inspect the books and records of Advanced Battery Technologies ("ABAT"), a deregistered company whose shares continued to trade on the OTC market. The case presented a series of issues, including whether the stockholder had a proper purpose, the scope of the stockholder's

---

traded companies and, accordingly, are given broader access to the corporation's financial records." *Holman*, 2007 WL 1074770, at *2; *see B & F Towing*, 551 A.2d at 51 ("When there is no external source of information as in small, family-owned or closely-held corporations, much of the information needed to determine value of a stock holding must come from the corporation.").

inspection, whether ABAT's status as an entity registered in China prevented ABAT from producing the bulk of the books and records sought, and whether a confidentiality restriction should be imposed. *Southpaw*, 2015 WL 915486, at \*4.

In *Southpaw*, a Master recommended a finding that Southpaw had articulated a proper purpose in seeking to value its shares, while at the same time recommending against a finding that Southpaw had articulated a proper purpose in claiming a need for information to assess the riskiness of ABAT's stock. The Master observed that the "Risk Assessment Purpose" appeared to be "a veiled effort to obtain all the information to which Southpaw might be entitled if ABAT were meeting its reporting requirements under SEC Rules." *Id.* at \*5. The Master therefore recommended that Southpaw receive a more limited set of information than what it had sought, and the Master recommended that ABAT be ordered to produce books and records from 2011 through the date of the court's order that were sufficient to enable Southpaw to determine ABAT's (i) revenue, (ii) income before tax, (iii) new income, (iv) earnings per share, (v) cash and equivalents, (vi) total assets, (vii) current asset figures, (viii) current liability figures, and (ix) stockholder equity. *Id.* at \*6.

On the issue of confidentiality, ABAT contended that it treated all of its financial information as confidential until such time as its financial statements were "converted to U.S. GAAP, audited and authorized for release." *Id.* at \*9. ABAT argued that because none of its financial information was public, Southpaw should be required to sign a confidentiality agreement that prohibited Southpaw from trading in ABAT stock until the information became public. *Id.* at \*9. As evidence of the need for a confidentiality restriction, the company cited three factors: that it "treat[ed] its financial information . . .

39

as confidential," that the company was "not presently reporting under SEC regulations," and that its financial information was not "maintained in a form appropriate for filing with the SEC." *Id.* at *9–10. Southpaw did not dispute that privately held companies "commonly and for good reason treat their financial results as confidential until such time, and in such form, as they choose to share those results." *Id.* at *9. Southpaw instead argued that ABAT had not provided any basis to obtain confidential treatment for its financial information because ABAT was required by law to disclose some of the information once it was converted to U.S. GAAP. *Id.*

The Master observed that "[b]ecause ABAT is not publicly reporting, it is more akin to a private company for purposes of this analysis." *Id.* at *9. She then explained that there was "good reason to err on the side of affording confidential treatment to books and records if there is a good faith basis to do so, until the Court can properly assess whether a particular document truly is confidential." *Id.* at *10. Notably, the Master recommended this approach to confidentiality despite expressing doubt that any of the financial information "truly [was] confidential" and after expressing skepticism that "financial results dating back more than a year [were] entitled to confidential treatment." *Id.*.

In addition to recommending this approach on the facts of *Southpaw*, the Master endorsed it for Section 220 cases in general, explaining that "[t]o so err helps preserve the expedited and summary nature of a Section 220 proceeding, allows an inspection to proceed in short order, and affords a stockholder the opportunity to challenge a confidential designation once the particular record has been made available." *Id.* To err on the side of

40

confidentiality, notwithstanding serious doubts about whether the information is confidential, is to apply a presumption of confidentiality.

It is not surprising that the Master took this approach, which was consistent with how the Court of Chancery treated confidentiality restrictions during that era. Rather than requiring a meaningful showing to obtain a confidentiality restriction, the court regularly followed *Disney*'s presumption of confidentiality.

The *Tiger* decision changed that. The *Tiger* decision specifically identified *Southpaw* as one of the decisions that incorrectly treated confidentiality agreements "as a matter-of-course." *Tiger*, 214 A.3d at 938 n.17. The *Tiger* decision rejected the notion that confidentiality agreements should be treated "as a matter-of-course so long as they are reasonable" *Id.* After *Tiger*, I do not believe that the Company can rely on *Southpaw* to support treating deregistered companies as if they were private entities under a presumption of confidentiality.

Rivest has argued persuasively that the Company's journey through the public markets must be taken into account. The fact that the Company accepted money from public investors and then took those investors dark with it undercuts the Company's claim of confidentiality. This factor weighs against a confidentiality restriction.

## 2. Factors Associated With Rivest

The parties next make arguments about Rivest himself. It makes sense that a court would take into account factors associated with the stockholder when assessing the need for a confidentiality restriction. Confidentiality is more likely to be warranted for stockholders with conflicting interests, such as a competitor, an entity seeking to acquire

41

the company, or a party already engaged in litigation with the company. Rivest is none of these things. He is a plain vanilla retail stockholder.

The Company has tried to depict Rivest as an "ultra-sophisticated investor" comparable to a short seller or activist hedge fund. As discussed in the Factual Background, Rivest did the work necessary to acquire a base of knowledge about investing, and he has a degree of financial sophistication. But Rivest is a traditional investor. He is not following a strategy that would benefit from the Company being harmed. Like other investors, he has an interest in having the value of his investment increase. This factor weighs against a confidentiality restriction.

### 3. Rivest's Purpose And The Documents Being Produced

Rivest also makes arguments about his purpose in seeking an inspection and the nature of the information that will be provided. He correctly points out that all books-and-records proceedings are not the same. Different purposes for inspection implicate different documents and give rise to different confidentiality concerns.

To take two recurring examples, there is a significant difference between a books-and-records proceeding in which a stockholder seeks documents to investigate potential wrongdoing and a books-and-records proceeding in which a stockholder seeks historical financial statements to value its shares. When investigating corporate wrongdoing, a stockholder typically seeks documents that reveal the inner workings of the company, including formal board materials (such as minutes, agendas, board books, and presentations), informal board materials (such as emails, scripts, notes, and talking points), and officer-level documents (such as emails, presentations, and notes). *Woods, Tr. of Avery*

42

*L. Woods Tr. v. Sahara Enters., Inc.*, 2020 WL 4200131, at \*11–12 (Del. Ch. July 22, 2020). Depending on the scope and nature of the investigation, it is easy to imagine some degree of confidentiality restriction may be warranted for documents of that type. Indeed, before *Tiger*, this court concluded that the "potential harm to, and chilling effect on, the candid communications between high ranking executives and the board" outweighs the benefit of disclosure of confidential board and officer-level materials in that context. *Pershing Square, L.P. v. Ceridian Corp.*, 923 A.2d 810, 823 (Del. Ch. 2007). It was also in this setting that the *Disney* court referred loosely to the concept of a presumption of confidentiality. *See* 857 A.2d at 447. In a subsequent case involving the same company, this court explained that the stockholder's legitimate interest in "monitoring how the boards of directors of Delaware corporations perform their managerial duties" had to be balanced against "the potential great harm to the deliberative process of the board, and the boards of directors of all Delaware corporations," if those deliberations routinely became public. *See Disney v. Walt Disney Co.*, 2005 WL 1538336, at \*4 (Del. Ch. June 20, 2005). After *Tiger*, those statements no longer operate as a general rule that presumptively favors confidential treatment, but they show the nature of the concerns in play.

A stockholder that wishes to value her shares usually seeks different types of documents. The invariable starting point is financial statements—both audited and unaudited and both annual and quarterly.[10] At times, a stockholder may show a need to

---

[10] *See, e.g.*, *Thomas & Betts Corp.*, 685 A.2d at 714 (ordering inspection of audited financial statements of the company and its subsidiaries for the last three years), *aff'd*, 681

43

look beyond the financial statements by obtaining copies of key contracts, entries from the general ledger, or accounting work papers. A stockholder also may be able to obtain potentially more sensitive documents, such as tax returns[11] or forward-looking documents, such as forecasts and projections.[12] As the documents become more granular and sensitive, the likely case for a confidentiality restriction grows.

Here, Rivest is seeking to value his shares. He is not seeking to explore corporate wrongdoing. He is not contemplating a lawsuit.

Moreover, for purposes of valuing his shares Rivest is only seeking audited financial statements and only for closed periods. He is thus seeking perhaps the most basic

---

A.2d 1026 (Del. 1996); *Carroll v. CM & M Gp., Inc.*, 1981 WL 7626, at *5 (Del. Ch. Sept. 24, 1981) (ordering inspection of, among other things, complete audited and unaudited financial statements for a five-year period), *aff'd*, 453 A.2d 788 (Del. 1982); *Bizzari v. Suburban Waste Servs., Inc.*, 2016 WL 4540292, at *7 (Del. Ch. Aug. 30, 2016) (ordering inspection of, among other things, company's financial statements, income statements, and balance sheets); *Jefferson v. Dominion Hldgs., Inc.*, 2014 WL 4782961, at *1 (Del. Ch. Sept. 24, 2014) (ordering inspection of "audited consolidated annual financial statements for the period of 2010 through 2013" (cleaned up)); *Quantum Tech. P'rs IV, L.P. v. Ploom, Inc.*, 2014 WL 2156622, at *10 (Del. Ch. May 14, 2014) (ordering inspection of company's audited annual financial statements for a three-year period, or to the extent that audited annual financial statements were not available, the company's unaudited annual financial statements, as well as the company's quarterly financial statements for all periods subsequent to the last annual financial statement).

[11] *See, e.g.*, *Thomas & Betts Corp.*, 685 A.2d at 714 (ordering inspection of federal tax returns for three-year period); *Bizzari*, 2016 WL 4540292, at *7 (ordering inspection of tax returns); *DFG Wine Co., LLC v. Eight Ests. Wine Hldgs.*, LLC, 2011 WL 4056371, at *8 (Del. Ch. Aug. 31, 2011) (same).

[12] *See, e.g.*, *Quantum*, 2014 WL 2156622, at *12 (ordering inspection of forecasts and projections and noting that the "importance of forecasts and projections to valuation of a company is so basic that it does not require citation").

documents necessary to achieve his purpose. He is not seeking financial statements for current periods that remain open. He is not seeking forward-looking projections. He is not seeking access to contracts that incorporate sensitive pricing terms. He is also not seeking the detailed information that underlies the financial statements, such as accountant work papers or excerpts from the Company's general ledger.

The Company responds that its financial statements are nonpublic, sensitive, and should be entitled to confidential treatment. The Company has shown that at present, it does not make its financial statements public. The Company has not shown that its financial statements are sensitive. "That certain information, for whatever reason or for no reason, has not become public may suggest a need for careful consideration of whether confidentiality is appropriate; however, that alone is not sufficient." *UICI*, 2005 WL 1377432, at *5. Instead, the corporation must point to "a reason for insisting upon confidential treatment." *Id.* at *5.

Here again, the Company cites *Southpaw*, this time for the proposition that if a nonreporting company treats its financial information as confidential, then the court should treat the information as confidential, regardless of whether the company has made the requisite showing of harm. As discussed previously, the *Southpaw* decision predated *Tiger* and applied a *de facto* presumption of confidentiality that does not survive under the post-*Tiger* regime. The Company's reliance on *Southpaw* is therefore unpersuasive.

Taken as a whole, these factors do not favor the imposition of a confidentiality restriction.

### 4. The Threat Of Harm

The Company's principal argument is that it needs a confidentiality restriction because it will suffer harm if its financial statements are not protected. Under *Tiger*, "a corporation need not show specific harm that would result from disclosure before receiving confidentiality treatment in a Section 220 case," but the trial court also "cannot conclude reflexively that the need for confidentiality is readily apparent." 214 A.3d at 937 (cleaned up). In this case, the Company has not demonstrated a meaningful risk of harm from the disclosure of its historical financial statements for closed periods. Instead, the Company has advanced claims of harm that are overblown and which border on the hyperbolic.

During trial, Plotkin did his best to depict the disclosure of the Company's financial statements as an existential threat. He claimed that public disclosure "would be a disaster" and "could potentially put the company out of business." Plotkin Tr. 102, 146–47. He repeated those themes throughout his testimony, asserting that disclosure of the Company's financial statements "would be a disaster for the Company," could lead to "hav[ing] to close the [C]ompany," "would have a catastrophic effect on the [C]ompany," "would cause a big harm to the [C]ompany," and would "have a harmful effect on the [C]ompany that could potentially put [the Company] out of business." *Id.* at 103–04, 118, 146–48, 163. To the dismay of propagandists everywhere, repetition does not make something true. The record at trial does not support Plotkin's sensationalized speculation about the risk of harm to the Company.

During trial, the Master asked both Plotkin and Tucciarone whether they could recall any specific events that would support their view that disclosure of the Company's

46

financial statements would harm the Company. Plotkin Tr. 149–50; Tucciarone Tr. 183–84. They both pointed to the same two examples from 2014: the reduction of the Company's trade credit and the loss of the Best Buy business.

Both Plotkin and Tucciarone testified that two of the Company's manufacturers reduced its lines of credit after the release of the 2013 10K disclosing the Company's financial statements. Plotkin Tr. 149–51; Tucciarone Tr. 173, 178–79. As noted previously, the manufactures did not take action against the Company because it disclosed its financial statements, but rather because of the information those statements provided about its financial condition. Both the 2013 10K and the financial statements disclosed a going-concern qualification. It is hardly surprising for lenders to reduce a company's lines of credit in the face of a going-concern qualification. That event does not suggest that the release of financial statements *qua* financial statements threatens harm.

Both Plotkin and Tucciarone also testified about the 2014 meeting between Plotkin and the Best Buy buyer. They gave parallel accounts, but only Plotkin had first-hand knowledge of the event. According to the testimony, Plotkin saw a copy of the 2013 10K on the buyer's desk, along with samples of a competitor's products. The buyer told Plotkin that Best Buy would no longer carry the Company's product, and the competitor's product subsequently appeared on Best Buy's shelves. Although Plotkin and the buyer did not discuss the 2013 10K, Plotkin inferred that the competitor must have told Best Buy that the Company was a bad risk as a supplier and provided the Company's financial statements as evidence. Accepting Plotkin's inference, Best Buy's decision was not based on the availability of financial statements, but rather based on the Company's financial condition.

47

Other than these two incidents from 2014, neither Plotkin nor Tucciarone could think of any specific examples to support their claim that disclosure of the Company's financial statements would harm the Company. Plotkin simply reiterated that:

> if our confidential financial information were released to the public, that serious harm would come to the company. It's my belief that it will, but that's my belief. It's my position. As steward of the company, I'm responsible for keeping the company healthy. I'm responsible to all the shareholders. So I believe that if that information were, in fact, released, it would cause a big harm to the company. That said, it's my belief.

Plotkin Tr. 163.

Tucciarone conceded that he had no other examples; instead, he testified that the Company operates in a "pretty competitive environment" and that if he got his hands on a competitor's financial information that showed it was "doing very poorly," he would use it against the competitor. Tucciarone Tr. 184. There is nothing groundbreaking about this business truism. Tucciarone described the reality of life in a market economy. That is capitalism at work.

The only noteworthy aspect of Tucciarone's testimony is that from a historical standpoint, it did not turn out to be true. Portions of the Company's 2015 to 2018 federal tax returns were made public in 2020 in connection with unrelated litigation in New York. JXs 31–34. Tucciarone conceded that, despite this disclosure, there is no evidence that any competitor used information in those tax returns against the Company. Tucciarone Tr. 183.

The claim that the Company will face harm if its financial statements fall into the hands of a competitor only makes sense if the Company's financial condition is poor. The Company's officers seem to believe that their counterparties would not want to be in

48

business with them if they knew the Company's true financial condition. They are effectively seeking a confidentiality restriction so that they can continue to create a misleading impression about the Company's financial strength. That is not an equity that favors a confidentiality restriction.

The manner in which the Company proceeded in this litigation also undercuts the credibility of its claim regarding harm. In the Company's April 2020 letter to the court, its first filing in this action, the Company argued that it did not need to disclose the Company's financial statements to Rivest because financials were "no longer required to be disclosed after the [Company's] filing of Form 15 with the SEC." Dkt. 12 at 3. The Company also argued that it could not disclose the requested financial information because it would create issues under Regulation FD. *Id.* The Company did not claim that disclosure of its financial statements would harm the Company, let alone that public disclosure would be so detrimental that it would put the Company at risk of going out of business. If public disclosure of the Company's financial statements actually posed an existential threat, it is hard to believe that Plotkin would not have mentioned that in the April 2020 letter.

Instead, the Company appears to be doing everything it can to resist the efforts of a stockholder pursuing a legitimate inspection. During the course of his efforts to obtain books and records, Rivest has made three demands. Each sought basic information. The Company ignored the first two, forcing Rivest to file this lawsuit. Once Rivest took that step, the Company ignored the lawsuit too. Only when a default loomed did the Company rouse itself. Then, in its answer, the Company took aggressive positions and asserted a litany of affirmative defenses.

As the litigation became prolonged, Rivest served a third demand. The Company ignored that one as well. The Company also resisted a straightforward motion to amend to bring the demand within the scope of the case and countered with a motion for summary judgment. Motion practice is disfavored in a books-and-records proceeding, and the Company advanced the dubious argument that Rivest was proceeding for an improper purpose as a matter of law. As trial loomed, the Company sought to postpone trial with its Emergency Motion. The Company never filed a pre-trial brief.

The Master exhibited exemplary patience in overseeing this case. In my view, the Company's litigation tactics can be taken into account in assessing the credibility of its witnesses' assertions. That is true even when counsel takes the actions in question. An attorney serves as the client's agent, so the actions the attorney takes and the statement the attorney makes can be imputed to the client.[13] The Company's litigation strategy involved ignoring the lawsuit, then raising unsupportable defenses and filing over-the-top motions. Those tactics were part of a scorched-earth strategy that culminated in the Company's witnesses giving overblown testimony at trial.

---

[13] *Gebhart v. Ernest DiSabatino & Sons, Inc.*, 264 A.2d 157, 160 (Del. 1970) (under "our system of representative litigation, each party must be deemed bound by the acts of his lawyer-agent."); *accord Vance v. Irwin*, 619 A.2d 1163, 1165 (Del. 1993); *see Zutrau v. Jansing*, 2014 WL 6901461, at *4 (Del. Ch. Dec. 8, 2014) ("Lawyers serve as agents of their clients; so long as lawyers act within their appropriate discretion, clients are bound by the actions of their attorneys."), *aff'd*, 123 A.3d 938 (Del. 2015). *See generally* Grace M. Giesel, *Client Responsibility for Lawyer Conduct: Examining the Agency Nature of the Lawyer-Client Relationship*, 86 Neb. L. Rev. 346, 350–56 (2007) (collecting and summarizing authorities regarding attorney's status as agent).

On this issue of the Company's showing of harm, in exercising *de novo* review, I weigh the evidence differently than the Master. She credited the testimony that Plotkin and Tucciarone gave about the threat of harm. To my ear, that testimony was exaggerated and relied on a formulaic assertion about the reality of conducting business in a free-market economy. If I were to accept that that testimony as a basis for a confidentiality restriction, I would be endorsing a presumption in disguise. The *Tiger* decision does not permit that result. In my view, the Company failed to provide a credible basis for a threat of harm sufficient to warrant a confidentiality restriction. To the extent that I accept the Company's claimed threat for purposes of the balancing required by *Tiger*, I regard it as extremely weak.

### 5. The Balancing Of Interests

Under *Tiger*, when a court evaluates whether a confidentiality restriction should be put in place, the court must consider not only the company's showing, but also take into account the interests of the stockholder. As discussed in the prior sections, the Company's showing falls short. Against that meager showing, Rivest has identified important interests.

Rivest has an important interest in using the Company's financial statements to value his shares. As part of his efforts to determine a value for his ownership interest in a long dark company, he wishes to confer with other stockholders about the value of the Company and his stock. Under the confidentiality restriction that the Master recommended, Rivest could not share any financial statements from the last two years with his fellow stockholders when conferring regarding a value for the Company's shares. Rivest thus

51

could not give a fellow stockholder the most current and material financial information about the Company. A fellow stockholder would have to pursue that information for itself.

Other stockholders of the Company should not be forced to run the gauntlet that Rivest has survived to obtain comparable information. This decision has discussed how the Company has disregarded Rivest's rights and resisted his effort to conduct a straightforward inspection. Rivest has an interest in sharing the information he received with his fellow stockholders so that they can participate in discussions about value.

Rivest also has an interest in being able to sell his shares. "Modern corporate law recognizes that stockholders have three fundamental, substantive rights: to vote, to sell, and to sue." *Strougo v. Hollander*, 111 A.3d 590, 595 n. 21 (Del. Ch. 2015). At present, because the Company has not disclosed any information since 2014, there is no public market in the Company's shares. Rivest and other retail investors cannot exercise their right to sell.

Decades ago, in an early case involving the production of valuation-related information by a privately held company, the Delaware Supreme Court instructed this court to balance the corporation's interest in protecting its confidential information against the interest of the stockholder in selling its holdings. *See CM & M Gp., Inc. v. Carroll*, 453 A.2d 788, 790 (Del. 1982). The court directed the court to order production of the company's financial information conditioned on a requirement that "neither the plaintiff nor any agent of his shall disclose information obtained as a result of these proceedings to anyone who has not first made a written representation to the plaintiff that he is a bona fide prospective purchaser of [the plaintiff's] stock and executed an agreement of

confidentiality." *Id.* at 794. The court thus accommodated the stockholder's right to sell.

*See also Ostrow*, 1994 WL 114807, at *13 (permitting stockholders to share valuation information with anyone "who has a need to know in connection with assisting them with respect to their investment in [the company]").

The Company is not a privately held entity as in *CM & M*, but rather an entity whose shares would trade in the OTC market if the Company were to comply with the Quotation Rule. As such, the precedent that bears the closest resemblance to this case is *Ravenswood Inv. Co., L.P. v. Winmill & Co. Inc.*, 2014 WL 2445776 (Del. Ch. May 30, 2014). There, a stockholder sought to inspect quarterly and annual financial statements to value its shares in a nonreporting company that traded on the OTC market. *Id.* at *2. The corporation sought to impose a restriction that would prevent the plaintiff from trading after receiving nonpublic information. *Id.* The court rejected this restriction.

> The overall argument advanced by Winmill—that a corporation could condition access to the information necessary for a stockholder to value its stock on an agreement not to trade—would inappropriately frustrate this fundamental stockholder right. The whole point of valuing stock is so that a stockholder can determine what to do with it: to buy, to sell, or to use the value for some other appropriate purpose. After all, is there even a readily ascertainable value to stock that cannot be traded, under Winmill's proposal, for possibly an entire year? The Court is unwilling to incorporate such an inequitable notion into Delaware's Section 220 jurisprudence. Based on the arguments submitted by the parties, the Court concludes that the trading restriction proposed by Winmill is contrary to Delaware law.

*Id.* at *4. Operating in a pre-*Tiger* era, the *Ravenswood* court declined to address the issue of confidentiality, stating that "[w]hether Ravenswood's access to Winmill's financial statements should otherwise be contingent on executing an 'appropriate' confidentiality

agreement—as Ravenswood itself proposed in its inspection demand letter—appears to be an issue that is best initially addressed by the parties, not by the Court." *Id.*

In the post-*Tiger* era, the *Ravenswood* approach to confidentiality is no longer viable Instead, both *CM & M* and *Ravenswood* indicate that this court should take into account Rivest's interest in being able to exercise his fundamental right to sell his shares.

After the promulgation of the Quotation Rule, there are only three ways to trade in the stock of a dark company. The first is in the Expert Market, where broker-dealers can publish unsolicited quotations from third parties that are restricted from public view and are only available to broker-dealers and accredited investors. Because the Expert Market is not available to retail investors, it is not a viable option for ninety percent of the Company's stockholders.

A second avenue is the OTC market, but that option is only available if a Market Maker can satisfy the necessary requirements to provide an actionable quotation, including the Current Information Requirement. Because the Company refuses to disclose its financial statements or allow Rivest to inspect the documents without a confidentiality restriction, there is no way that a Market Maker can satisfy the Quotation Rule. Unless a Market Maker can satisfy the Current Information Requirement, the OTC market is not a viable option.

The third potential avenue for trading is the unofficial and unregulated grey market. When trading in the grey market, there are no quoted prices available at which buyers and sellers can transact. Due to the absence of regulation, the grey market lacks price transparency and carries a significant risk of fraud. *See* Final Notice at 68144.

Citing the potential that Rivest could provide the Company's financial statements to a Market Maker, the Company asserted before the Master that "Rivest is attempting to use Section 220 to 'pry open a non-public company's financial records for all to devour,' and that he will use the financial information to circumvent the [Quotation Rule] and undermine federal securities policy." *Report*, 2022 WL 203202, at *7 (quoting the Company's argument (cleaned up)). That assertion was part of the Company's contention that Rivest was seeking an inspection for an improper purpose. The Master recommended a contrary finding that Rivest was proceeding for a proper purpose. No one took exceptions to that recommendation.

It is therefore established—and the evidence supports the view—that Rivest intends to operate within the SEC rules and consistent with federal securities policy. One possible way to determine the value of his stock is to obtain a quotation from a Market Maker. Before a Market Maker can publish a quotation for the Company's stock on the OTC market, it must comply with the requirements of the Quotation Rule, including the Current Information Requirement. The Market Maker does not need to receive the necessary information from the Company itself. The Market Maker may obtain and review "information from an independent and objective source representing that it received the information directly from the issuer." Final Notice at 68169. Thus, if Rivest were to provide the Company's financial statements to a Market Maker, he would be doing what the SEC allows.

In making her recommendation about a confidentiality restriction, the Master did not give weight to Rivest's ability to obtain a quotation under the Quotation Rule on the

55

ground that "this [c]ourt does not craft use and confidentiality restrictions on a Section 220 production based upon the rights and restrictions found in federal securities laws." *Report*, 2022 WL 203202, at *9. In support of this view, the Master cited *Southpaw*. The Company makes the same argument in opposition to Rivest's exceptions.

The *Southpaw* report did not say that this court never considers the federal securities laws when dealing with Section 220 actions. The *Southpaw* report addressed the more narrow argument, made by the plaintiff in that case, that the production order should require the company "to disclose publicly any of the books and records it produces for inspection, to avoid any implicit trading restriction that may otherwise apply to Southpaw under Regulation FD." 2015 WL 915486, at *11. The Master in *Southpaw* correctly noted that such an order "would give stockholders a mechanism under Delaware law to enforce federal securities law regulations." *Id.* The Master saw no reason to create such a procedure, explaining that "[w]hatever their obligations under Regulation FD, the parties may independently assess those obligations and determine how to comply with them without an order from this Court." *Id.* Building on this concern, the Master cautioned that Section 220 should not be converted into a method of enforcing the requirements of the federal securities laws.

> I do not believe ordering parties to comply with federal law is consistent with the intent of Section 220. The inspection right afforded to stockholders under Section 220 is an important feature of the Delaware General Corporation Law, but it is a right entirely separate from the complex overlay of rights and regulations created under the federal securities laws. . . . Although I sympathize with [the plaintiff] that it may need to devise a way to inspect the records and value its shares without violating Regulation FD, or alternatively choose not to inspect the books and records because of that regulation, I do

56

not believe it is either necessary or appropriate for this Court to remedy that issue.

*Id.*

All of that makes sense, but the issue addressed in *Southpaw* is different than the issue presented in this case. There, the stockholder sought to use Section 220 as a vehicle for enforcing the securities laws. Here, the stockholder seeks to enforce a right to obtain financial statements under Section 220, then use the financial statements in a way that he is permitted to do under the securities laws.

In my view, this court should not ignore the federal securities laws when considering requests for information under Section 220. Instead, Delaware law should strive to maintain its historically symbiotic relationship with the federal securities laws.[14] Achieving that goal requires taking into account aspects of the federal securities laws and the policies they seek to achieve. To that end, this court has taken the federal securities law into account when making determinations under Delaware law.[15] This court also has done so in Section

---

[14] *See, e.g.*, Marcel Kahan & Edward Rock, *Symbiotic Federalism and the Structure of Corporate Law*, 58 Vand. L. Rev. 1573, 1619–22 (2005) (describing the "significant symbiotic element to the relationship between federal law and Delaware law"); Mark J. Roe, *Delaware's Competition*, 117 Harv. L. Rev. 588, 639 (2003) (explaining the federal government's role as a potential force in corporate law and the need for Delaware to take into account federal interests).

[15] *See, e.g.*, *In re F. Mobile, Inc.*, 2021 WL 1040978, at *5 (Del. Ch. Mar. 18, 2021) ("The Delaware authorities addressing efforts to revive defunct entities for use as blank check companies reflect a consistent Delaware public policy against allowing capital-markets entrepreneurs to deploy Delaware law to bypass the federal securities laws that govern stock offerings. That policy is based on this court's understanding of the federal securities laws and the SEC's priorities"); *Klamka v. OneSource Techs., Inc.*, 2008 WL

57

220 actions. For example, in *Polygon*, Vice Chancellor Lamb found that the stockholder had a proper purpose in valuing its stock, but he denied relief because the company's SEC filings had already provided all the necessary and essential information. 2006 WL 2947486, at *4 ("Through its preliminary and final proxy materials, and its Schedule 13E-3, and amendments, West Corp. would appear to have disclosed all material information necessary for Polygon to determine whether or not to seek appraisal."); *see Holman*, 2007 WL 1074770, at *2 ("[P]ublic filings typically provide significant financial information about the company, and inspection rights are narrowly tailored to address specific needs. The Court will limit or deny any inspection to the extent that the requested information is available in a corporation's public filings." (footnotes omitted)).

In adopting the Quotation Rule, the SEC determined that conditioning a Market Maker's ability to issue a price quotation on the possession of a basic quantum of information "facilitate[s] price discovery, provide[s] investors with information that will allow them to make better-informed investment decisions and help[s] counteract

5330541, at *2 (Del. Ch. Dec. 15, 2008) (declining to appoint custodian that would allow Delaware corporation to be used for reverse merger to bypass traditional public registration process); *Esopus Creek Value LP v. Hauf*, 913 A.2d 593, 606 (Del. Ch. 2006) (ordering Delaware corporation to hold annual meeting and noting that "there is reason to suppose that the SEC will duly consider a request for exemptive relief by [the defendant company] for the purpose of allowing it to convene a meeting of stockholders in accordance with this court's order"); *Clabault v. Caribbean Select, Inc.*, 805 A.2d 913, 918 (Del. Ch. 2002) (declining to order annual meeting pursuant to 8 *Del. C.* § 211(c) where order would allow Delaware corporation to be used to bypass traditional public registration process), *aff'd*, 846 A.2d 237 (Del. 2003); *Meredith v. Security Am. Corp.*, 1981 WL 7634, at *2 (Del. Ch. Nov. 18, 1981) (holding that lack of financial information needed to solicit proxies under SEC regulations is no defense to action to compel a stockholder meeting).

misinformation about the issuers of such securities that can contribute to incidents of fraud and manipulation." Final Notice at 68127. The Quotation Rule does not require that a Market Maker obtain the necessary information from the company; the Market Maker can look to other reliable sources.

Permitting Rivest to use Section 220 to obtain financial statements for closed periods and provide them to a Market Maker comports with SEC policy as reflected in the Quotation Rule. In my view, it would run contrary to Delaware's efforts to maintain a symbiotic relationship with the federal securities laws to impose a confidentiality restriction that would close off that avenue. Adopting the Master's recommendation of a two-year confidentiality restriction would have that effect.

Rivest has established a significant interest in obtaining financial statements for closed periods free of any confidentiality restriction. The Company has not made a showing sufficient to outweigh Rivest's interest and warrant a two-year confidentiality restriction.

In reaching this conclusion on the facts of this case, I again acknowledge that I am balancing the considerations differently than the Master. As this decision has sought to emphasize, the Master issued a careful, thorough, and thoughtful report, and I would adopt it if I were reviewing the Report under a deferential standard, such as for abuse of discretion or clear error. The Delaware Supreme Court did just that in *Tiger*, where it reviewed this court's ruling for abuse of discretion. 214 A.3d at 936–37. Although the justices disagreed with this court's "formulation of the principles governing confidentiality in the Section 220 inspection context," they held that the confidentiality order fell within a range of reasonableness and did not constitute an abuse of discretion. *Id.* at 935.

Under *DiGiacobbe*, I must conduct a *de novo* review of both the facts and the law. *DiGiacobbe*, 743 A.2d at 184. After reviewing the evidence *de novo* and considering the implications of *Tiger*, I find that the Company did not make a persuasive showing of harm that is sufficient to outweigh Rivest's interests or support imposing a two-year confidentiality restriction on financial statements for closed periods.

This decision only applies to the facts of this case. This decision does not suggest that a corporation cannot make the showing necessary to subject financial statements to confidentiality restriction. In this case, the Company failed to carry its burden.

## III. CONCLUSION

Rivest is entitled to inspect the Company's quarterly and annual financial statements and reports, including cash flow statements, balance sheets, and income statements, for the years 2016 through 2020. The financial statements are not subject to any confidentiality restrictions.

Within ten days, the parties will submit a final order that has been agreed upon as to form. If there are issues that remain before this case can be resolved at the trial level, then in lieu of an agreed-upon final order, the parties will submit a joint letter that identifies the issues that remain to be resolved and proposes a schedule for addressing them.